## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 13-38329 |
| | ) | |
| KEVIN J. BARRY, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| JOAN GALLONI, | ) | Adversary Case No. 14-00034 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN J. BARRY and | ) | |
| BARRY LAW GROUP, P.C., | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## MEMORANDUM OPINION

Joan Galloni (the "Plaintiff") filed an adversary complaint in the bankruptcy case of

Kevin J. Barry (the "Debtor"), seeking a determination that a judgment debt owed to her by the

Debtor and the Barry Law Group, P.C. (the "Barry Law Group") is not dischargeable pursuant to

11 U.S.C. §§ 523(a)(4) and (a)(6).[1]  According to the Plaintiff, the debt should be excepted from

discharge based on the Debtor's purported misconduct in connection with the preparation and

execution of a will under which the Plaintiff was named as a beneficiary.  For the reasons set

forth below, the Court finds in favor of the Plaintiff and against the Debtor and the Barry Law

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to
1532, and the Federal Rules of Bankruptcy Procedure.

Group (together, the "Defendants") and holds that the judgment debt is nondischargeable under both §§ 523(a)(4) and (a)(6).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (I).

## BACKGROUND

The pertinent facts are drawn from the parties' pleadings, the exhibits attached thereto, and the Court's docket, as well as the testimony and various exhibits received into evidence at a bench trial that was held on June 8, 2015. At that trial, the Debtor admitted many of the facts that he had initially denied in his answer. Thus, virtually all of the material facts alleged in the complaint are uncontested. Those facts are as follows.

The Debtor, an attorney and the principal owner/shareholder of the Barry Law Group, has been licensed to practice law in the state of Illinois since November 1994.[2] (Answer ¶ 1; Trial Tr. morning session ("Trial Tr. 1"), 9:4-13; Trial Tr. afternoon session ("Trial Tr. 2"), 5:7-9.) He concentrates his practice in the areas of estate planning, probate, and real estate and has prepared more than one hundred wills in the last twenty years. (Trial Tr. 1, 9:25-10:6; Trial Tr. 2, 5:7-20.)

On February 22, 2011, the Debtor was retained by Josephine Wilke ("Wilke"), the Plaintiff's first cousin, to prepare various legal documents, including her last will and testament, a durable power of attorney, and an amendment to a land trust agreement. (Answer ¶¶ 2, 7; Trial

---

[2] At trial, the Debtor testified that he had been practicing under the corporate form Barry Law Group, P.C. in the year 2011 but that he is no longer practicing law under that name. (Trial Tr. 1, 10:11-14; 16:19-25.)

Tr. 1, 9:18-24, 17:1-11; Trial Tr. 2, 18:3-6, 23:5-12.)  Their initial meeting took place at the

Smith Village senior center in Chicago ("Smith Village"), where Wilke was rehabilitating after

having fallen and broken her hip.  (Trial Tr. 1, 19:4-22; Trial Tr. 2, 19:7-10.)  During that

meeting, the Debtor spoke with Wilke for about forty-five minutes, ensuring that she was

competent to execute the documents that he was being asked to prepare and making the relevant

inquiries as to her wishes with respect to the disposition of her property.  (Trial Tr. 1, 19:23-20:7;

20:25-21:16; Trial Tr. 2, 23:3-4.)  In particular, the Debtor learned that Wilke wanted to appoint

the Plaintiff as the executor of her will, to donate a total of $15,000 to three different charities,

and to leave the residue of her estate to the Plaintiff.  (Trial Tr. 1, 22:19-23:4.)  The Debtor also

learned that Wilke's closest living relative was her brother Frank Wilke ("Frank") and that Wilke

did not want Frank to receive anything under the will.  (*Id.* at 20:8-16; 23:5-14.)  Instead, Wilke

told the Debtor, she had provided for her brother by naming him as a beneficiary of or joint

owner on various accounts.  (*Id.* at 23:15-23.)

Shortly after meeting with Wilke, the Debtor drafted a will pursuant to her stated wishes.

(Answer ¶ 8; Pl.'s Ex. 2 ¶ 4.)  Article 1 of the will confirmed that Wilke was not married and had

no children.  (Pl.'s Ex. 1; Trial Tr. 1, 28:16-18.)  Article 2 addressed the gifts to the Plaintiff and

the three charities.  (Pl.'s Ex. 1; Trial Tr. 1, 28:19-29:6.)  And Article 4 named the Plaintiff as the

executor of the estate.  (Pl.'s Ex. 1; Trial Tr. 1, 29:7-10.)

On February 25, 2011, the Debtor returned to Smith Village for the execution of the will.

(Answer ¶ 9.)  The only people in the room at the time of the execution were Wilke, the Debtor,

and the Plaintiff.[3]  (Pl.'s Ex. 2 ¶ 5; Trial Tr. 2, 26:8-12.)  The Debtor reviewed the statements in

the will with Wilke, confirmed that she understood them and that they reflected her wishes, and

instructed her to sign the will, which she proceeded to do.  (Answer ¶ 11; Trial Tr. 1, 31:10-15;

Trial Tr. 2, 27:7-11.)

The signature page to the will included both a statement of certification and an affidavit.

The Debtor knew that, pursuant to Illinois law, the signatures of at least two disinterested

witnesses to Wilke's signing of the will were needed under each.  (Answer ¶ 13; Trial Tr. 1,

31:18-32:4, 42:4-9; *see also* Pl.'s Ex. 1 at 6.)  The certification provided as follows:

> The testator, JOSEPHINE V. WILKE, signed this Will in our
> presence on the date it bears.  Immediately thereafter, at the
> testator's request and in the testator's presence and in the presence
> of each other, we signed our names as witnesses.  We certify that
> we believed the testator to be of sound mind and memory at the
> time of signing.

(Pl.'s Ex. 1 at 6.)  The affidavit provided, in turn, as follows:

> We, the undersigned, being the attesting witnesses to the Will of
> JOSEPHINE V. WILKE, being first duly sworn, depose and state:
> (a) that each of us was present and saw the testator sign the Will, of
> which this Affidavit is a part, in our presence[;] (b) that the Will
> was attested by each of us in the presence of the testator, and in the
> presence of each other; and [(c)] that at the time the testator signed
> the Will, of which this Affidavit is a part, each of us believed the
> testator to be of full age and sound mind and memory, and acting
> voluntarily and not under duress or constraint of any kind.

(*Id.*)  The Debtor signed his name under each paragraph as the first of the two witnesses to the

will.  (Answer ¶ 14; Trial Tr. 42:10-12; *see* Pl.'s Ex. 1 at 6.)  He also signed the name of a

---

[3] Both the Debtor and the Plaintiff testified that there were others at Smith Village at the time in question,
including a receptionist, nurses, and other staff members.  (Trial Tr. 1, 42:16-44:7; Trial Tr. 2, 26:15-27:4.)  Only an
aide walked into the room during the execution of the will, however, and only briefly, to check on Wilke.  (Pl.'s Ex.
2 ¶ 5; Trial Tr. 2, 26:18-21.)

second witness, Timothy Murphy ("Murphy"), in both places on the signature page. (Answer ¶ 15; Trial Tr. 1, 32:18-20, 34:16-35:1.) Murphy is a construction manager who co-owned a building with the Debtor. (Trial Tr. 1, 41:19-20.) He was neither present, nor did he witness the execution of Wilke's will or sign the document. (*Id.*, 32:14-20, 35:3-7.)

The Debtor admits that he signed Murphy's name to the signature page, but there is disagreement as to when this occurred. The Plaintiff testified that the signature page was already completed when the Debtor came to Smith Village and that the Debtor said to Wilke, "I've already got the witnesses' signatures to expedite things." (Trial Tr. 2, 24:2-25:11.) The Debtor categorically denied that the signature page had been prepared ahead of time. (Trial Tr. 1, 40:1-19; Trial Tr. 2, 49:14-22.) Rather, the Debtor testified that he had made arrangements for Murphy to meet him at Smith Village but that Murphy had failed to come. (Trial Tr. 1, 41:8-13, 117:24-118:24.) According to the Debtor, he realized that he had not secured a second independent witness only when he got back to his office, and then, during a momentary "lapse of judgment," he signed Murphy's name on the signature page. (Answer ¶ 16; Trial Tr. 1, 45:12-18, 46:1-11, 118:7-119:16; Trial Tr. 2, 7:3-13.)

In any case, once he returned to his office, the Debtor directed his secretary, Kathleen O'Connell ("O'Connell"), to notarize the signature page, which she proceeded to do. (Trial Tr. 1, 34:6-12, 35:15-18, 130:13-15.) The notarization provided that the parties who signed the page appeared before O'Connell and were put under oath. (*Id.*, 34:6-12, 120:23-121:5; *see* Pl.'s Ex. 1 at 6.) Murphy had not appeared before O'Connell, and O'Connell did not see him sign his name on the signature page. (Trial Tr. 1, 35:3-7, 39:14-20.)

5

The Debtor knew that the will was invalid because it had not been witnessed in accordance with Illinois law. (Answer ¶ 17; Trial Tr. 1, 46:19-23; Trial Tr. 2, 16:4-8.) Despite this knowledge, the Debtor did not have the will re-executed, even though he acknowledged that a re-execution could have been done and the situation corrected. (Answer ¶ 18; Trial Tr. 1, 46:12-18, 50:2-51:9, 93:12-19.) Nor did he advise Wilke or the Plaintiff of the invalidity of the will, "[m]ostly out of embarrassment" about the mistake he had made. (Answer ¶ 21; Trial Tr. 1, 46:19-47:6, 52:24-54:2; Trial Tr. 2, 9:24-10:6.)

On March 6, 2011, nine days after the execution of the will, Wilke died. (Answer ¶ 19; Pl.'s Ex. 9; Trial Tr. 1, 49:24-50:1.)

Subsequently, the Plaintiff retained the Debtor to represent her as executor of Wilke's estate. (Answer ¶¶ 3, 5, 20; Trial Tr. 2, 35:16-21.) Although the Plaintiff testified that she became the Debtor's client upon Wilke's death (Trial Tr. 2, 46:1-6), a "probate retainer agreement" was not executed by the parties until April 20, 2011 (Trial Tr. 1, 54:13-55-7; Trial Tr. 2, 45:14-46:6; see Pl.'s Ex. 11). Pursuant to that agreement, the Barry Law Group was to receive 4.5% of the value of the gross estate in exchange for legal services, including the probate of Wilke's will. (Pl.'s Ex. 11 at 7; Trial Tr. 1, 55-19-25.)

In March 2011, the Debtor prepared and filed a petition for probate of the will in the Circuit Court of Cook County. (Answer ¶¶ 4, 22; Pl.'s Ex. 16; Trial Tr. 1, 59:21-61:20.) The Debtor instructed the Plaintiff to sign the petition as the petitioner, which she proceeded to do. (Trial Tr. 1, 61:1-5; see Pl.'s Ex. 16.) Among the representations on the document was a statement that the petitioner believed that the will was "the valid last will of the testator." (Trial Tr. 1, 60:21-25; see Pl.'s Ex. 16.)

6

Between March 2011 and October 2011, the Debtor represented the Plaintiff in proceedings before the state court without revealing to the court that the will was invalid. (Answer ¶ 24.)  During the same time period, the Debtor did not inform the Plaintiff about the invalidity of the will and, in fact, assured the Plaintiff that there were no problems with respect to the will.  (*Id.* at ¶¶ 21, 25; Trial Tr. 1, 97:4-9; Trial Tr. 2, 35:25-36:2, 36:11-20.)  Nor did the Debtor advise the Plaintiff that his own interests in concealing his misconduct were adverse to hers.  (Answer ¶ 26.)  According to the Debtor, he remained silent about his misconduct because he wanted the will to be admitted to probate and he knew that Wilke's last wishes would not be carried out if he revealed what he had done.  (Trial Tr. 2, 11:15-19.)

On May 9, 2011, an order was entered in state court admitting the will to probate.  (*See* Answer ¶ 32; Pl.'s Ex. 3.)   About two months later, Frank filed a petition contesting the will (Trial Tr. 1, 66:12-21; *see* Answer ¶ 24), and, shortly thereafter, the state court conducted a hearing for proof of the will (Trial Tr. 1, 69:11-16; *see* Answer ¶ 27).  The Debtor did not attend the hearing.  (Trial Tr. 1, 69:22-24.)

In September 2011, the Debtor spoke to the Plaintiff about the state court will contest, explaining that Frank's attorneys wanted to work out a settlement.  (*Id.*, 70:7-11; Trial Tr. 2, 38:7-18.)  The parties dispute what was said regarding Murphy testifying at the will contest.  The Debtor testified that he told the Plaintiff only that Murphy was supposed to appear in court but that he refused to do so.  (Trial Tr. 1, 71:7-74:18; Trial Tr. 2, 10:16-21.)  He made these statements, he said, because he wanted the Plaintiff to believe that Murphy witnessed the execution of the will and that he might be testifying in support of the will.  (Trial Tr. 1, 72:12-22.)  In contrast, the Plaintiff said that the Debtor told her that Murphy had actually testified in

7

court. (Trial Tr. 2, 38:19-40:14.)  According to the Plaintiff, the Debtor told her that Murphy's

reply to every question asked by the state court judge was that he did not remember and that, in

response, the judge had a "perplexed look" on his face.  (*Id.*)

In October 2011, the Debtor revealed his misconduct to the state court, to Frank's

attorneys, and to the Illinois Attorney Registration and Disciplinary Commission (the "ARDC").

(Answer ¶ 27.)  On October 28, 2011, the Debtor executed an affidavit in which he stated that

Murphy was not present at the time the will was executed, that Murphy did not witness Wilke's

signature to the will, and that he, the Debtor, signed Murphy's name as a second witness.  (*Id.* at

¶¶ 28, 30; Pl.'s Ex. 2 ¶ 7.)  Subsequently, the state court judge removed the Debtor from the

probate case. (Answer ¶ 31; Trial Tr. 1, 76:2-5.)  On October 31, 2011, the state court entered

two orders:  The first provided that the will was invalid for lack of proper attestation and vacated

the order admitting the will to probate; the second ordered that the will be denied admission to

probate. (Answer ¶ 32; Pl.'s Ex. 3; Trial Tr. 1, 78:5-79:12.)  As a result of the Debtor's conduct,

Wilke's testamentary intent was thwarted.  (Trial Tr. 1, 81:17-20, 97:20-98:2, 99:17-21.)

On November 8, 2011, the Plaintiff filed a malpractice suit in state court against the

Debtor and the Barry Law Group.  (Answer ¶ 35; Trial Tr. 1, 83:1-84:2.)  After deposing the

Debtor on November 13, 2012, the Plaintiff filed a motion for judgment on the pleadings and/or

summary judgment on the legal malpractice complaint.  (Answer ¶¶ 36, 81; *see also id.* at ¶¶ 38-

40, 53-55, 57.)  On April 24, 2013, the state court granted the Plaintiff's motion and entered

judgment on the pleadings in favor of the Plaintiff and against the Debtor and the Barry Law

Group in the amount of $590,221.87.  (*Id.* ¶¶ 82, 84, 85; Pl.s' Ex. 8; Trial Tr. 1, 83:14-21, 85:24-

86:1.)  That judgment remains unpaid and has been accruing interest at a rate of 9% per annum

since the date of its entry.[4]  (Answer ¶¶ 85, 87.)

While the malpractice suit was pending, the ARDC prosecuted a disciplinary action

before the Illinois Supreme Court against the Debtor for various violations of his professional

duties.[5]  (*Id.* at ¶ 41; Trial Tr. 1, 88:1-11.)  In connection with that suit, the ARDC filed a petition

on October 24, 2012 to impose discipline on consent.  (Answer ¶ 42; Pl.'s Ex. 5.)  Among other

allegations, the petition asserted that the Debtor knew that the will was invalid because it has not

been witnessed in accordance with the requirements of Illinois law, that he took no action to have

the will re-executed prior to Wilke's death, that he falsely assured the Plaintiff that no problems

existed with respect to the will, that he failed to provide the Plaintiff with advice as to how to

deal with the situation, and that he did not advise her that his own interests were adverse to hers.

(Answer ¶ 49; Pl.'s Ex. 5 ¶¶ 7, 9.)  In conjunction with the ARDC's petition, the Debtor

submitted an affidavit, dated August 20, 2012, in which he admitted that the assertions in the

ARDC's petition were "true and complete" and that he "freely and voluntarily" joined in the

petition.  (Answer ¶ 45; Pl.'s Ex. 6; Trial Tr. 1, 88:20-90:4.)  In exchange, the Debtor received a

sixty-day suspension of his law license.  (Answer ¶ 74; Trial Tr. 1, 88:12-16; *see* Pl.s' Ex. 5 ¶

17.)

---

[4] Under Illinois law, "[j]udgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied . . .." 735 ILCS 5/2-1303; *see also* Answer ¶ 86.

[5] The ARDC alleged that the Debtor engaged in the following misconduct in violation of the Illinois Rules of Professional Conduct:  (a) failure to provide competent representation of a client; (b) bringing a proceeding, or asserting or controverting an issue therein, where there is no basis in law or fact for doing so; (c) making a false statement of fact or law to a tribunal; (d) offering evidence the lawyer knows to be false; (e) conduct involving dishonesty, fraud, deceit, or misrepresentation; (f) conduct that is prejudicial to the administration of justice; and (g) conduct which tends to defeat the administration of justice or bring the courts or the legal profession into disrepute. (Pl.'s Ex. 5 at 3-4.)

9

On September 30, 2013, about five months after the entry of the state court judgment in

the malpractice case, the Debtor filed a voluntary petition for relief under chapter 7 of the

Bankruptcy Code.  On January 14, 2014, the Plaintiff filed the instant adversary complaint,

seeking a determination that the state court judgment is nondischargeable pursuant to §§

523(a)(4) and (a)(6).  The parties subsequently filed motions for summary judgment, both

contending that there were no genuine issues of material fact and that each was entitled to

judgment as a matter of law with respect to all of the elements under the two statutory

exceptions.[6]  On August 28, 2014, the Court denied the cross-motions for summary judgment,

explaining that because the existence of a fiduciary relationship and intent were in dispute, there

were genuine issues of material fact, precluding resolution of the matter on summary judgment.

(*See* Docket No. 35.)  On December 9, 2014, the Plaintiff filed an amended complaint, and the

Debtor filed his answer on February 2, 2015.   The Court held an evidentiary hearing on June 8,

2015 and then took the matter under advisement.  After a review of all of the relevant pleadings,

exhibits, and testimony elicited at trial, the Court is now ready to rule.

## DISCUSSION

The Plaintiff has invoked two of the statutory exceptions to discharge under § 523(a) of

the Bankruptcy Code.  The discharge provided by the Code aims to effectuate the "fresh start"

goal of bankruptcy relief.  *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002).  As

the party seeking to establish an exception to discharge, the Plaintiff bears the burden of proof by

a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Bero*,

---

[6] On April 4, 2014, the Debtor responded to the complaint by filing a 12(b)(6) motion to dismiss.  Almost
four months later, on July 24, 2014, the Plaintiff filed a motion for summary judgment. The Court subsequently
converted the Debtor's motion to dismiss and related briefs to a motion for summary judgment.

110 F.3d 462, 465 (7th Cir. 1997). Exceptions to discharge must be construed strictly against the

Plaintiff and liberally in favor of the Debtor. *See In re Morris*, 223 F.3d 548, 552 (7th Cir.

2000). Additionally, § 523(a) is to be "narrowly construed so as not to undermine the Code's

purpose of giving the honest but unfortunate debtor a fresh start." *Shriners Hosp. for Children v.

Bauman (In re Bauman)*, 461 B.R. 34, 44 (Bankr. N.D. Ill. 2011) (internal quotation omitted).

## 1. Section 523(a)(4)

First, the Plaintiff contends that the judgment debt owed to her by the Debtor is

nondischargeable pursuant to § 523(a)(4). Under that statute, a debtor cannot discharge any debt

"for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11

U.S.C. § 523(a)(4). Thus, to demonstrate a claim under § 523(a)(4), the Plaintiff must prove that

the Debtor committed: (1) fraud or defalcation while acting as a fiduciary; or (2) embezzlement;

or (3) larceny. *See id.* The Plaintiff has invoked only the fraud or defalcation prong of the

statutory exception.

In order to prevail under that prong, the Plaintiff must establish the following elements:

(1) the existence of an express trust or fiduciary relationship between her and the Debtor; and (2)

fraud or defalcation committed by the Debtor in the course of that relationship. *See Follett

Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765-66 (7th Cir. 2011);

*Kafantaris v. Signore*, Nos. 10 C 7320, 09 B 13534, 09 A 667, 2011 WL 1743416, at *3 (N.D.

Ill. May 5, 2011); *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 477 (Bankr. N.D. Ill. 2011).

The Plaintiff does not allege that an express trust existed between her and the Debtor;

rather, she contends that there was a fiduciary relationship between the parties. In the Seventh

Circuit, a fiduciary relationship for purposes of § 523(a)(4) may arise when there is either an

11

express trust or "a difference in knowledge or power between fiduciary and principal which . . .

gives the former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116

(7th Cir. 1994); *Jacobs*, 448 B.R. at 477; *see also Berman*, 629 F.3d at 769-70 (explaining that a

relationship "in which one party to the relation is incapable of monitoring the other's

performance" satisfies the § 523(a)(4) requirement (internal quotation omitted)); *In re McGee*,

353 F.3d 537, 541 (7th Cir. 2003) (noting that "many fiduciary relations are characterized by

disparities in the knowledge or economic status of the participants"). Only fiduciary duties

existing prior to the debt fall within the ambit of the statutory exception. *Berman*, 629 F.3d at

769.

Here, the Plaintiff argues that a fiduciary relationship existed between her and the Debtor

by virtue of her status both as an intended beneficiary under the will and, later, as the executor of

Wilke's estate. With respect to the former, the Plaintiff relies on state law for the proposition

that an attorney owes a fiduciary duty to intended third-party beneficiaries under a will. As to the

latter, the Plaintiff contends that the law imposed a fiduciary obligation on the Debtor as a result

of the attorney-client relationship.

The existence of a fiduciary relationship under § 523(a)(4) is a matter of federal law.

*McGee*, 353 F.3d at 540; *Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 801 (Bankr. N.D.

Ill. 1995). Thus, the traditional nonbankruptcy definition of a fiduciary relationship–"a

relationship involving confidence, trust, and good faith–is far too broad and therefore not

applicable in bankruptcy." *Id.* (internal quotation omitted). Nevertheless, courts also consider

state law relevant in deciding whether a debtor was acting as a fiduciary under federal law.

*Johnson v. Woldman*, 158 B.R. 992, 995 (N.D. Ill. 1993); *Pearson v. Howard (In re Howard)*,

12

339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Accordingly, the Plaintiff urges the Court to look to Illinois case law in deciding whether the Debtor owed her a fiduciary duty as an intended third-party beneficiary under Wilke's will.

As a general rule under Illinois law, an attorney owes a duty only to his client. *DeLuna v. Burciaga*, 857 N.E.2d 229, 247 (Ill. 2006). However, an exception to that rule has been recognized "in limited circumstances when an attorney is hired by a client specifically for the purpose of benefitting a third party." *Id.* "[T]he key factor to be considered is whether the attorney acted at the direction of or on behalf of the client for the benefit of [the] third party." *Schwartz v. Cortelloni*, 685 N.E.2d 871, 876 (Ill. 1997). Under this exception, the Illinois Supreme Court has found that an attorney who prepared a will owed a fiduciary duty to intended third-party beneficiaries of the attorney-client relationship under that will. *McLane v. Russell*, 546 N.E.2d 499, 502-04 (Ill. 1989) (citing *Pelham v. Griesheimer*, 440 N.E.2d 96 (Ill. 1982)). The Plaintiff here asks the Court to make the same finding.

The mere existence of a state law fiduciary relationship is not always sufficient to except debts from discharge under § 523(a)(4). "[O]nly a subset of fiduciary obligations is encompassed by the word 'fiduciary'" in the statutory provision, *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996), and only those fiduciary relationships that "impose[] real duties in advance of the breach" fall within the scope of § 523(a)(4), *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000) (quoting *Marchiando*, 13 F.3d at 1116); *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 774 (Bankr. N.D. Ill. 2010) (same); *see also Berman*, 629 F.3d at 769. In other words, the debtor must have been a fiduciary "before the wrong giving rise to the debt occurred." *Adas v. Rutkowski*, No. 13 C 2517,

13

2013 WL 6865417, at *6 (N.D. Ill. Dec. 30, 2013) (citing *Davis v. Aetna Acceptance Co.*, 293

U.S. 328, 333 (1934)).

In this matter, the uncontested facts establish that the Debtor had fiduciary obligations to

the Plaintiff as an intended beneficiary under Wilke's will. Specifically, under Illinois state law,

the Debtor owed the Plaintiff a fiduciary duty when he drafted the will. He knew that Wilke

wanted to leave the residue of her estate to the Plaintiff, and he drafted the will accordingly.

Among the wrongs giving rise to the debt was the Debtor's signing of Murphy's name on the

signature page of the will, an event that took place *after* the drafting of the document. Thus, the

fiduciary obligations that the Debtor owed to the Plaintiff as an intended beneficiary under the

will existed prior to the Debtor's signing of Murphy's name. Further, given the Debtor's

substantial expertise in the areas of estate planning and probate, there was a marked disparity in

knowledge between him and the Plaintiff which gave him a position of ascendancy over her.

Thus, a fiduciary relationship existed between the Debtor and the Plaintiff as an intended

beneficiary under the will for purposes of § 523(a)(4).

Likewise, the Debtor owed a fiduciary duty to the Plaintiff in her capacity as executor of

Wilke's estate. The Seventh Circuit has plainly held that the attorney-client relationship can

constitute a fiduciary relationship, *Marchiando*, 13 F.3d at 1115, and the evidence establishes

that the Plaintiff retained the Debtor as her attorney to represent her as executor. That attorney-

client relationship was created upon Wilke's death, which preceded the Debtor's preparation and

filing of the petition for probate of the invalid will, his instruction to the Plaintiff to sign the

petition, and his silence about the invalidity of the will for a period of eight months during which

he represented the Plaintiff as her lawyer. Therefore, the Debtor's fiduciary duty to the Plaintiff

14

as the executor of the estate existed in advance of the breach. Accordingly, the Court finds that

there was a fiduciary relationship between the Debtor and the Plaintiff as executor under §

523(a)(4).

As for the second prong of the statutory exception, the undisputed facts also establish

both defalcation and fraud. The Court will address each of these in turn.

"Defalcation" is not defined in the Bankruptcy Code. The term has been loosely defined

as "'the failure to meet an obligation; a nonfraudulent default.'" *Bullock v. BankChampaign,*

*N.A.*, 133 S. Ct. 1754, 1757 (2013) (quoting *Black's Law Dictionary* 479 (9th ed. 2009)).

"Defalcation" has also been defined as "a failure to account for money or property that has been

entrusted to another." *Zitt v. Roberts (In re Roberts)*, Nos. 10 B 06420, 10 A 01298, 2011 WL

4102540, at *7 (Bankr. N.D. Ill. Sept. 14, 2011) (internal quotation omitted).

Although intent or bad faith is not necessary, the United States Supreme Court recently

held that, for purposes of § 523(a)(4), defalcation requires knowledge of, or gross recklessness

with respect to, the improper nature of the fiduciary's conduct. *Bullock*, 133 S. Ct. at 1758-61;

*see also Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994) (holding that defalcation requires

at least reckless conduct). Specifically, the Supreme Court explained that defalcation "requires

an intentional wrong" and that "[w]here actual knowledge of wrongdoing is lacking, [the Court]

consider[s] conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to)

a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty."

*Bullock*, 133 S. Ct. at 1759 (internal quotation omitted).

The Debtor argues that there was no defalcation in this matter. Specifically, he contends

that he did not accept or manage any property of Wilke's estate, other than his fees for the work

15

performed, and that he reimbursed the estate for all fees paid by the Plaintiff in connection with the will. (Trial Tr. 1, 112:16-22, 115:12-16; Trial Tr. 2, 6:12-21, 43:22-25; *see* Pl.'s Ex. 10.) The Debtor further argues that he had no intent to harm the Plaintiff and that what happened was an unfortunate, unexpected consequence of a momentary "lapse of judgment."

Although the parties agree that the Debtor did not control any of Wilke's money or accounts (Pretrial Statement at 10 ¶¶ 9-11; Trial Tr. 2, 44:11-13), the uncontested evidence establishes that the Debtor failed to meet an obligation that he owed to the Plaintiff as both an intended beneficiary under the will and the executor of Wilke's estate and that his misconduct caused Wilke's testamentary intent to be thwarted. The Debtor knew that his signing of Murphy's name, his filing of the petition for probate of the invalid will, and his subsequent silence regarding his conduct were wrong, and he consciously disregarded the "substantial and unjustifiable risk" that his actions would result in the violation of his fiduciary duty to the Plaintiff. Given the nature and purpose of the Debtor's conduct and the fact that he knew that Frank and not the Plaintiff would inherit Wilke's estate if the will were found to be invalid, the Debtor's disregard of that risk was a *"gross deviation* from the standard of conduct that a law-abiding person would observe" in his situation. *See Bullock*, 133 S. Ct. at 1760. Thus, the Court concludes that the Debtor committed defalcation while acting as a fiduciary to the Plaintiff under § 523(a)(4).

Despite the Debtor's insistence that he did not intend to defraud the Plaintiff and that his misconduct was the result of a momentary "lapse of judgment," the Court also finds that the Plaintiff has met her burden to establish that the Debtor committed fraud. For purposes of § 523(a)(4), fraud requires intentional deceit. *Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re*

*Fairgrieves)*, 426 B.R. 748, 754 (Bankr. N.D. Ill. 2010). The Seventh Circuit has broadly

defined fraud as "any deceit, artifice, trick, or design involving direct and active operation of the

mind, used to circumvent and cheat another[.]" *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th

Cir. 2000) (internal quotation omitted); *see also Dragisic v. Boricich (In re Boricich)*, Nos. 08 B

15248, 08 A 00728, 2011 WL 2600692, at *9 (Bankr. N.D. Ill. June 29, 2011) (quoting

*McClellan*). Further elaborating, the Seventh Circuit has explained that "[f]raud is a generic

term, which embraces all the multifarious means which human ingenuity can devise and which

are resorted to by one individual to gain an advantage over another by false suggestions or by the

suppression of truth." *McClellan*, 217 F.3d at 893. Although there is "[n]o definite and

invariable rule [that] can be laid down as a general proposition defining fraud, . . . it includes all

surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *Id.*

The evidence here establishes that the Debtor's conduct was intentionally deceitful. He

knowingly and purposefully, "with direct and active operation of the mind," forged Murphy's

name on the will, directed his secretary to notarize the forged signature page, filed the petition for

probate, and concealed his misconduct, all in an attempt to deceive the Plaintiff, as well as the

state court and Frank's attorneys, into believing that the will was validly witnessed. Further, the

Debtor does not dispute that he committed forgery (Trial Tr. 1, 34:16-35:1), and for purposes of

exceptions to discharge under § 523(a), forgery is treated as fraud, *see Danborn v. Prewitt (In re*

*Prewitt)*, 486 B.R. 518, 521 n.3 (Bankr. D.N.M. 2013); *Leiva v. Schenk (In re Schenk)*, Nos. 09-

10840, 09-1064, 2010 WL 1257744, at *4 (Bankr. E.D. La. Mar. 26, 2010).

Having considered all of the evidence, the arguments of the parties, and applicable law, the Court finds that the Debtor committed fraud or defalcation while acting as a fiduciary. Thus, the Court holds that the judgment debt is nondischargeable under § 523(a)(4).

## 2. Section 523(a)(6)

The Plaintiff also argues that the judgment debt is not dischargeable under § 523(a)(6). That provision excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). To demonstrate a claim under § 523(a)(6), the Plaintiff must prove that the Debtor: (1) intended to and caused an injury; (2) acted willfully; and (3) acted maliciously. *See Fairgrieves*, 426 B.R. at 756; *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 641 (Bankr. N.D. Ill. 2004).

Willfulness requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (quoting *Geiger*). In other words,"willful" means intent to cause injury, not simply the commission of an intentional act that results in injury. *Koplin v. Ginsberg (In re Ginsberg)*, Nos. 08 B 30836, 09 A 188, 2009 WL 4891815, at *5 (Bankr. N.D. Ill. Dec. 16, 2009) (citing *Geiger*); *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 704 (Bankr. N.D. Ill. 2002) (same). Negligently or recklessly inflicted injuries do not fall within the ambit of § 523(a)(6). *Geiger*, 523 U.S. at 64. For purposes of the statutory exception, "willfulness" can be found if either the Debtor subjectively intended to injure the Plaintiff or knew that injury was substantially certain to result from his acts. *See Horsfall*, 738 F.3d at 774 (explaining that a plaintiff can establish "willfulness" by showing that the "debtor's motive was to inflict the injury . . . or the debtor's act was substantially certain to result

18

in injury" (internal quotation omitted)); *see also Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir.

2015) (quoting *Horsfall)*; *Zamora v. Jacobs (In re Jacobs)*, 403 B.R. 565, 581 (Bankr. N.D. Ill.

2009).

As to the malice element, conduct is "malicious" if it is undertaken "in conscious

disregard of one's duties or without just cause or excuse." *In re Thirtyacre*, 36 F.3d 697, 700

(7th Cir. 1994) (internal quotation omitted); *see also Horsfall*, 738 F.3d at 774 (quoting

*Thirtyacre)*; *Fairgrieves*, 426 B.R. at 757; *Vozella v. Basel-Johnson (In re Basel-Johnson)*, 366

B.R. 831, 850 (Bankr. N.D. Ill. 2007). Accordingly, to establish malice under § 523(a)(6), the

Plaintiff must prove that the Debtor (1) intentionally committed a wrongful act, (2) which caused

injury to the Plaintiff, and (3) which was done without just cause or excuse. *See Bauman*, 461

B.R. at 49; *Basel-Johnson*, 366 B.R. at 850. The Debtor need not have acted with ill will or a

specific intent to harm the Plaintiff in order for his conduct to be considered malicious. *See id.*

Here, the Plaintiff alleges: (1) that the Debtor's intentional signing of Murphy's name on

the signature page of Wilke's will caused her to be injured, (2) that the Debtor knew that his act,

upon discovery, was certain to cause the will to be found invalid, and (3) that the Plaintiff would

thereby be deprived of the property that Wilke intended to give her. In opposition to the

Plaintiff's allegations, the Debtor claims that while he may have acted negligently, what

happened was essentially a mistake that he ultimately failed to rectify–and then made worse–out

of embarrassment. The Debtor contends that he did not intend to injure the Plaintiff, that she

cannot *prove* that his intention was to injure her, and that he, thus, did not act "willfully." In

short, the Debtor argues that the Plaintiff is seeking to make a debt caused by a negligently

inflicted injury nondischargeable under § 523(a)(6).

19

The Court rejects the Debtor's arguments. As set forth above, one way a plaintiff can establish willfulness for purposes of the statutory exception is by showing that a debtor knew that injury was substantially certain to result from his conduct. *See Gerard*, 780 F.3d at 811; *Horsfall*, 738 F.3d at 774; *Jacobs*, 403 B.R. at 581. The "substantial certainty" test is consistent with the Code's "fresh start" goal in that it "focuses on whether the injury was in fact anticipated by the debtor[.]" *Fid. Fin. Servs. v. Cox (In re Cox)*, 243 B.R. 713, 719 (Bankr. N.D. Ill. 2000) (internal quotation omitted) (discussing the "substantial certainty" test in the context of conversion). The test is also consistent with *Geiger*, which requires a showing that the debtor intended the consequences of his harmful actions. *Id.*

In this matter, the Debtor unquestionably knew that injury to the Plaintiff was substantially certain to result from both his wrongful signing of Murphy's name on the signature page of Wilke's will and his subsequent failure to get the will re-executed prior to Wilke's death. Notwithstanding the Debtor's testimony that only two wills that he had prepared throughout his career–including Wilke's–required a formal prove-up (Trial Tr. 2, 5:21-6:1), he clearly understood what the consequences would be if the will were found to be invalid. The Debtor has been licensed to practice law in Illinois for over twenty years, has extensive experience in the areas of estate planning and probate, and had prepared more than one hundred wills over the course of his career. Prior to the drafting of the will, he learned that Wilke had no spouse, no children, and no grandchildren but that she did have a brother for whom there was to be no provision in the will. (Trial Tr. 1, 20:8-16, 23:5-14.) The Debtor understood the intestate rules of distribution in Illinois and knew that Wilke's brother would be a taker under those rules if there were no will or if the will were found to be invalid. (*Id.*, 23:25-25:4.) Additionally, he

20

knew that Illinois law required the signatures of two disinterested witnesses to a will and that if there was a defect in the attestation, there was a real risk that the will could be held invalid by a court. (Answer ¶ 13; Trial Tr. 1, 31:18-34:1.)

Despite all of the Debtor's experience and knowledge, he signed Murphy's name on the signature page to the will. And even though he admitted that he subsequently knew that the will was invalid because it had not been properly witnessed, he neither revealed his misconduct to Wilke or the Plaintiff nor took action to have the will re-executed. As an attorney with expertise in estate planning and probate, the Debtor had to have known, without doubt, that injury was substantially certain to result from his false signing of Murphy's name, his failure to correct the situation before Wilke's death, and the subsequent concealment of his misconduct.

In addition to the requisite intent under § 523(a)(6), the undisputed facts establish that the Debtor's false signing and his failure to subsequently re-execute the improperly attested will prior to Wilke's death were wrongful and intentional, caused injury to the Plaintiff, and were done "without just cause or excuse," thus satisfying the malice element of the statutory exception. As to the latter, the Debtor offered no cause or excuse for intentionally providing a false signature and then failing to fix the situation. Rather, he merely explained that he experienced a momentary "lapse of judgment" when he signed Murphy's name and that he failed to reveal or fix the mistake he had made because he was embarrassed. Despite his proclamations that he did not act with ill will or a specific intent to harm the Plaintiff, the key to satisfying the "maliciousness" prong is "consciousness of wrongdoing." *Nicholas & Assocs., Inc. v. Morgan (In re Morgan)*, Nos. 09 B 42248, 10 A 00253, 2011 WL 3651327, at *7 (Bankr. N.D. Ill. Aug. 18, 2011) (internal quotation omitted). Here, the Debtor's direction to his secretary to notarize

21

the signature page with the false signatures, followed by eight months of silence–to the Plaintiff,

to the state court, and to Frank's attorneys–as to the invalidity of the will, evidence not only the

Debtor's consciousness of his wrongdoing but also the lengths that he went to in order to conceal

his misconduct.

In sum, the Court finds that the Plaintiff has demonstrated the requisite elements to prove

a claim under § 523(a)(6).  Accordingly, the Court holds that the state court judgment is excepted

from discharge under that statutory exception.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of the Plaintiff and against the

Defendants and holds that the judgment debt owed to the Plaintiff by the Defendants in the

amount of $590,221.87, plus interest of 9% per year which has been accruing since April 24,

2013, is nondischargeable under both §§ 523(a)(4) and (a)(6).  A separate order will be entered

consistent with this Memorandum Opinion.


Dated: **October 9, 2015**          ENTERED:



                              Janet S. Baer
                              Bankruptcy Judge